Belknap,
No. 5211.

FRANK P. BAER

*v.*

ALFRED D. ROSENBLATT.

Argued June 2, 1964.
Decided October 6, 1964.

 

*Doherty & Dyer* and *McLane, Carleton, Graf, Greene & Brown* (*Mr. Stanley M. Brown* orally), for the plaintiff.

*Nighswander, Lord & Bownes* and *Conrad E. Snow* (*Mr. Hugh H. Bownes* orally), for the defendant.

LAMPRON, J.  On April 15, 1950, the Belknap county commissioners who had the legal control of the Belknap Recreational Area at Gilford, hired the plaintiff, Frank (Fritzie) P. Baer, as supervisor of the area. Their written agreement provided that Frank P. Baer will "supervise the collection and disbursement of all funds coming from or disbursed on account of said recreational area" (*par.* 5); "transmit all funds accruing from said recreational area to said county commissioners" (*par.* 6); "carefully examine all bills and invoices submitted relative to said recreational area and either approve or disapprove the same" (*par.* 7).

Under a renewed agreement, dated November 27, 1953, containing the above provisions, plaintiff continued as such supervisor until he was advised on June 23, 1959, that the county commissioners were exercising their right to terminate their contract effective July 10, 1959.

As of September 15, 1959, by virtue of Laws 1959, c. 399, the operation of this area was placed in a commission of five members. Dana S. Beane, Jr. was its first chairman. In November, 1959, the commission hired Warren Warner as manager of the area.

Since 1958, the defendant, a merchant in Laconia, regularly contributed a daily unpaid column in the Laconia Evening Citizen which was entitled "Out Of My Head." Some of these articles, starting with one published on December 11, 1958, referred to the plaintiff in conjunction with the Belknap Recreational Area.

Defendant's column, which is the basis of this action, was published January 29, 1960, when the plaintiff was no longer connected with the area. It read in part as follows:

"Been doing a little listening and checking at Belknap Recreation Area and am thunderstruck by what am learning.

"This year, a year without snow till very late, a year with actually few very major changes in procedure; difference in cash income simply fantastic, almost unbelievable.

"On any sort of comparative basis, the Area this year is doing literally hundreds of per cent BETTER than last year.

"When consider that last year was excellent snow year, that season started because of more snow, months earlier last year, one can only ponder following question:

"What happened to all the money last year? and every other year? What magic has Dana Beane and rest of commission, and Mr. Warner wrought to make such tremendous difference in net cash results."

On March 9, 1960, the plaintiff instituted this action of libel alleging that the above article could be and was understood to mean "that the difference in the net cash results of the income of said Area was due because the plaintiff had committed larceny and that said money was stolen or embezzled or converted by the plaintiff to his own use and that . . . said false, scandalous, malicious and defamatory libels were calculated to bring plaintiff into hatred, contempt, ridicule."

On March 6, 1963, approximately three years after plaintiff instituted this action, the defendant moved for a change of venue. He based his motion on the fact that he "as a columnist has frequently made forthright, caustic, and barbed remarks about many affairs in the City of Laconia and in Belknap County, including . . . the management past and present of the Belknap County Recreation Area" and that his remarks "have undoubtedly ruffled the feelings of many people in Belknap County and have made him an object of antagonism by many people in Belknap County. . . . Some people admire his forthright comments . . . and many other people dislike him intensely for the

comments." He alleged that for this and other reasons it was probably impossible he would receive a fair and impartial trial in Belknap county.

The Superior Court has authority to change the venue in an action. RSA 507:11; *Cochecho Railroad* v. *Farrington*, 26 N. H. 428, 445. A change should be made if there is probable ground to apprehend that a fair and impartial trial cannot be had in the particular county. *Hilliard* v. *Beattie*, 58 N. H. 112. This is a matter within the discretion of the Trial Court whose determination will not be disturbed unless a plain abuse of that discretion is shown. *Whitcher* v. *Association*, 77 N. H. 405, 407. The record does not compel a conclusion that there was abuse. *State* v. *Small*, 99 N. H. 349, 352.

We agree with the statement in defendant's brief that "it seems clear that the questions of whether or not the plaintiff was within the orbit of the words of the article and whether the article imputed wrong-doing to the plaintiff were properly left for jury determination." As it could be found that the newspaper article complained of was defamatory of the plaintiff and damaging to him, the defendant could properly be found liable unless the publication was justified or excused.

Justification is established if the facts stated are true and are published with a justifiable motive. *Hutchins* v. *Page*, 75 N. H. 215; *Chagnon* v. *Union-Leader Co.*, 103 N. H. 426, 437. There was ample evidence to warrant a finding by the jury that the defamatory statements of facts made in this column were not substantially true and that the comments made thereon were unjustified. Restatement, Torts, *s.* 582, *comment* e; Prosser, Torts (2d *ed.*) *s.* 96, *p.* 632.

"Even though a defendant cannot justify the publication because it can be found to be untrue he may excuse it by showing it was privileged. A conditional privilege, which is what is claimed here, is established if the facts, although untrue, were published on a lawful occasion, in good faith, for a justifiable purpose, and with a belief, founded on reasonable grounds of its truth." *Chagnon* v. *Union-Leader Co.*, *supra*, 438.

Statements of facts and comments based thereon made by the defendant about the management of the Belknap Recreational Area could be found to constitute a lawful occasion and the basis of a privilege. However they would constitute a lawful occasion and a privilege only if they were published in good faith and with a belief, founded on reasonable grounds, of their

truth. *State* v. *Burnham*, 9 N. H. 34; *Lafferty* v. *Houlihan*, 81 N. H. 67, 71. A court, therefore, cannot rule that a communication is privileged in the public interest without assuming the conditions on which it is held to be privileged, namely, that it was made with good motives and upon probable grounds of its truth. *Lafferty* v. *Houlihan, supra*, 72. Where, as in this case, the motives of the defendant and his basis for believing his statements to be true were both in controversy, the Trial Court properly denied defendant's motion that it rule before trial that his article, in the absence of malice or bad faith, was privileged in the public interest.

For the same reason the Trial Court properly refused defendant's request that the jury be charged as a matter of law that there was a lawful occasion for the publication of defendant's article. An examination of the Court's charge in its entirety reveals that the jury was properly instructed on these issues.

The law is well established that a defamatory statement made with malice cannot be excused as privileged. *Chagnon* v. *Union-Leader Co.*, 103 N. H. 426, 438. Also when the element of malice enters into the wrong the rule of damages is different and more liberal. *Bixby* v. *Dunlap*, 56 N. H. 456, 462, 463. The burden of proving malice to defeat the defense of privilege as well as to invoke the more liberal rule of damages is on the plaintiff. *Hutchins* v. *Page*, 75 N. H. 215; *Saladino* v. *Gurdy*, 80 N. H. 211; 1 Harper & James, Law of Torts, s. 5.27, *p.* 455. The Trial Court properly defined malice in its charge to the jury as "ill will, evil motive, intention to injure or a wanton or reckless disregard of the rights of others. Malice . . . may consist of the intentional publication of defamatory matters with a reckless disregard of the rights of others, and it may consist of willfully doing an act or a willful neglect of an obligation which the writer knows is liable to injure another, regardless of the consequences, even though there is no actual intention to hurt or harm an individual." *Chagnon* v. *Union-Leader Co., supra*; *New York Times Company* v. *Sullivan*, 84 S. Ct. 710, 726 (1964).

The defendant stated in part in the article complained of "Been doing a little listening and checking at Belknap Recreation Area and am thunderstruck by what am learning. This year, a year without snow till very late . . . difference in cash income simply fantastic, almost unbelievable. On any sort of comparative basis, the Area this year is doing literally hundreds of per cent

BETTER than last year. When consider that last year was excellent snow year . . . one can only ponder following question: What happened to all the money last year? and every other year?"

Defendant testified that by "literally hundreds of per cent BETTER" he meant to say that the cash income for "this year" was more than twice but not necessarily more than three times what it was "last year." The jury could find on the evidence that on the figures available when defendant wrote his article there was very little difference in the cash income for the two years compared in defendant's column.

Defendant testified "had I not been told that there was a great difference between that January and the other January, I would probably not have had occasion to write the article." There was evidence from which the jury could find that the sources of information given by the defendant as bases for his statements gave no support for what he wrote. "Probable cause is undoubtedly a circumstance, and a strong one, to rebut any presumption of malice; as the absence of it is evidence to show malice." *State* v. *Burnham*, 9 N. H. 34, 44; *Shackett* v. *Bickford*, 74 N. H. 57; 1 Harper & James, Law of Torts, *s.* 5.27, *p.* 455; 33 Am. Jur., Libel and Slander, *s.* 266, *p.* 248.

In an article dated January 9, 1959, defendant asked a series of questions about the operation of the area which he invited the plaintiff or the county commissioners to answer. On January 12, plaintiff's son, who worked at the area, endeavored to answer these questions by a letter to the editor published in the Laconia Evening Citizen and in it he also invited defendant to obtain a copy of all area expenditures and income at the county court house and stated that "I do feel that the best answers to all the people's doubts and questions can best be answered by the County Comm., County delegation members, and Area management at the annual Budget meeting open to all county residents. This meeting is coming up soon." On January 21, defendant published in his column that he had not yet heard from the plaintiff and the commissioners as to these questions. On January 27, defendant's column stated that the plaintiff in a public speech on January 22, said he was not going to answer the questions and defendant asked "why."

In an article published February 14, 1959, the defendant characterized the area as "an antique relic run for benefit of one family and favored few friends." June 25, 1959, after

plaintiff's employment had been terminated, defendant wrote "Commisshes responsible for hiring and firing of County personnel. That their legal duty and obligation. Cannot offhand simply assume they did it without reason. Maybe they had darned good reasons. Not fair jump to conclusions without having asked them. After all Fritzie did have substantial portion his own family on county payroll. Maybe this good . . . maybe not. Certainly on face of it, nepotism hardly best kind public policy." January 29, 1960, the column which is the basis of this action asked "What happened to all the money last year? and every other year?" The plaintiff was supervisor of the area in charge of income and disbursements during the time inquired about.

Any or all of the statements in these articles could be considered by the jury in their determination of whether the defendant was actuated by malice in publishing the article of January 29, 1960. *Saladino* v. *Gurdy*, 80 N. H. 211, 213; 2 Wigmore, Evidence, *ss.* 403, 404. We are of the opinion that the jury could find on the evidence that the defendant lacked reasonable grounds to believe in the truth of the statements he published; that by his prior utterances he demonstrated animosity toward the plaintiff; and that the defamatory statements, which are the basis of this action, were published with actual malice and consequently not privileged. *Chagnon* v. *Union-Leader Co.* 103 N. H. 426, 440.

We consider next the following argument of the defendant as stated in his brief. "The verdict of $31,500 against the defendant, brought about by the failure of the Trial Court to grant defendant's motions for nonsuit and for directed verdict on the grounds of privilege, his failure to direct the jury that defendant's published criticism was a matter of public concern, and that defendant was entitled to the defense of privileged criticism, his leaving to the jury the issue of malice of which there is no evidence, and his placing the burden on the defendant to prove the truth of his criticism, was a violation of the First and Fourteenth Amendments of the United States Constitution." Reliance for this position is placed on *New York Times Company* v. *Sullivan*, 84 S. Ct. 710 (1964).

The *Times* case was an action for libel brought by one of three elected commissioners of the city of Montgomery, Alabama, as a result of a Times "editorial" advertisement communicating information, expressing opinion, reciting grievances, protesting

claimed abuses, and seeking financial support on behalf of certain negro movements. A verdict of $500,000 was returned for the plaintiff. "Under Alabama law as applied in this case, a publication is 'libelous per se' if the words 'tend to injure a person . . . in his reputation' or to 'bring [him], into public contempt'. . . . Once 'libel per se' has been established, the defendant has no defense as to stated facts unless he can persuade the jury that they were true in all their particulars. . . . Good motives and belief in truth do not negate an inference of malice, but are relevant only in mitigation of punitive damages if the jury chooses to accord them weight. . . . Unless he [defendant] can discharge the burden of proving truth, general damages are presumed, and may be awarded without proof of pecuniary injury." *New York Times Company* v. *Sullivan, supra,* 719.

The court held that the First and Fourteenth Amendments of the Federal Constitution require a federal rule that "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.,* 726. This rule "delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct." *Id.,* 727.

Under New Hampshire law even if there is a libel *per se* defendant need not prove the truth of the stated facts to escape liability. He may escape liability if he proves a privilege by showing that the facts (although untrue) were published on a lawful occasion, in good faith, for a justifiable purpose, and with a belief, founded on reasonable grounds, of their truth. *Chagnon* v. *Union-Leader Co.,* 103 N. H. 426, 438. "This is a very different thing from showing the actual truth." *Carpenter* v. *Bailey,* 53 N. H. 590, 594. It has long been our law that good motives and belief in truth are strong circumstances to rebut any inference of malice. *State* v. *Burnham,* 9 N. H. 34, 44. *Carpenter* v. *Bailey, supra.*

Under New Hampshire law, unlike the Alabama law which prevailed in the *Times* case, even if the defendant in an action based on a libel *per se* cannot prove the truth or substantial truth of what was published, there can be no recovery if the defendant establishes the defense of privilege and it is not rendered inoperative by his actual malice which is not to be presumed but proved by the plaintiff. *Lafferty* v. *Houlihan,* 81

N. H. 67; *Hutchins* v. *Page*, 75 N. H. 215. Furthermore, our cases require that a plaintiff, be he a public official or not, must prove by a preponderance of the evidence that the libelous statements were defamatory of him and also the extent of the damage which they caused. *Chagnon* v. *Union-Leader Co.*, 103 N. H. 426, 436. Our law also demands that all plaintiffs prove that the defamatory publication applied to them. We do not subscribe to the proposition rejected in the *Times* case that "an otherwise impersonal attack on governmental operations was a libel of an official responsible for those operations." *New York Times Company* v. *Sullivan*, 84 S. Ct. 710, 732.

The Trial Court correctly charged the jury on all these applicable principles of law. The instructions did not require the defendant to prove the truth of a privileged communication if it was made with good motives and reasonable belief of its truth. We have ruled that the record contained sufficient evidence to warrant a finding that the plaintiff had sustained his burden of proving actual malice by the defendant. We find no conflict with the *Times* decision.

Defendant's motion to set aside the verdict as excessive was denied by the Trial Court. We set out in *Chagnon* v. *Union-Leader Co., supra,* 446 the standard for our action in the circumstances: "The consideration of the defendant's motion involved questions of fact for the Judge and his decision should not be set aside unless no reasonable person would make it . . . In most jurisdictions the view is taken that the Trial Judge, because of his more favorable position to determine the weight of the evidence and assess all the circumstances involved, may more freely interfere with the verdict than the appellate court and that his decision upon this question will be given great weight in passing upon the question on appeal." We also stated therein that the verdict in this case "must be assayed in the framework of our rule that 'when the element of malice enters into the wrong a more liberal rule of damages prevails.'" *Id.*

The evidence showed that the plaintiff's earnings increased from a low of $7,150 in 1954 to about $8,000 in 1958 which was his rate of pay at the area when his employment was terminated effective July 10, 1959. His life expectancy was shown to be 15.44 years. He was 61 at the time of the trial in 1963. His earnings for 1960 were about $300, for 1961 they were $6,491.82 and $5,994.50 for 1962. From the evidence the jury could find that but for the defendant's libel the plaintiff would

probably have secured employment at $8,000 per year in the ski or motorcycle industry or in similar lines of work. He had experience in public relations with the motorcycle industry and in managing a ski area. Consequently the jury could properly find a loss of earning caused by the libel of $7,000 in 1960, about $1,500 in 1961, and $2,000 in 1962 for a total of $10,500.

According to the evidence the effect of the article still continued at the date of the trial in April, 1963. "When Mr. Baer's name was mentioned, this fact of him being fired or let go from the Area came up at the same time." The jury could properly find as the natural and proximate result of the publication probable loss of future earnings for at least four more working years (to age 65), which on previous figures could amount to $6,000 or more. *Chagnon* v. *Union-Leader Co.,* 103 N. H. 426, 441.

When as in this case, the jury could find that the defamatory publication charged the plaintiff with a crime or with activities which would tend to injure him in his trade or business, plaintiff can recover for damages to his reputation resulting therefrom. *Id.*

Lastly there was evidence from which the jury could find actual malice on the part of the defendant and could award damages for mental distress and vexation which cannot be made the subject of exact pecuniary compensation. Restatement, Torts, *s.* 623. Also on a finding of malice a different and more liberal rule of damages prevails, that is, the jury is to "endeavor, according to their best judgment, to award such damages by way of compensation or indemnity as the plaintiff on the whole ought to receive and the defendant ought to pay." *Bixby* v. *Dunlap,* 56 N. H. 456, 464. We cannot say that the jury verdict did not come within that norm or that the Trial Court acted as no reasonable person would in refusing to set the verdict aside. *Wisutskie* v. *Malouin,* 88 N. H. 242, 246.

We consider next defendant's argument that the Trial Court should have permitted the introduction of evidence as to the disposition of a libel suit brought by plaintiff's son against the defendant based on the same article. This suit had been marked "Voluntary Nonsuit." The Trial Court instructed the jury that any other lawsuit arising out of this article and the disposition made of it has no bearing on the issues before them and should be disregarded. We see no error in this ruling. *Saykaly* v. *Manchester,* 97 N. H. 4, 5; *Masterson* v. *Railway,* 83 N. H. 190.

Defendant also excepted to the refusal of the Trial Court to admit evidence of the bringing and disposition of a suit brought by the plaintiff against the publisher of the newspaper in which defendant's column appeared. This action was settled for $2,000 on a covenant not to sue. The Court properly excluded this evidence and the amount received should be deducted from the verdict returned in the present action. *Masterson* v. *Railway*, *supra*; *Martel* v. *Wallace*, 83 N. H. 276, 279; *Burke* v. *Burnham*, 97 N. H. 203, 212.

*Judgment on the verdict.*

KENISON, C.J., concurred in the result; the others concurred.